Good morning. If it pleases the court, I would like to reserve five minutes. My name is Jack Sleeth of the law firm StatSardiano, Shinoff & Holtz. We have the honor of representing the Poway Unified School District and the individual defendants sued in this matter. As my first remarks, I would like to focus on the freedom of speech case. I'm sure the court is familiar with even this voluminous factual record, but the issue here is whether the district and these administrators violated Mr. Johnson's rights when they asked him to remove his banners and replace them with some posters that had the same language in them, but were in their original context or in a more historical context. The trial court erred by leaping over the threshold issue of whether Mr. Johnson's speech was protected and moving directly to a forum analysis. That was error for a couple of reasons, but I think the first reason is that this court has given us a very clear rule on how to approach employee speech in the Ng case, which followed the Pickering-Garcetti line of cases. If those first two elements of the Ng case are examined, Mr. Johnson has no speech rights and we don't get to that issue of whether a classroom is an open forum. What do we do about the fact that apparently they give him a bulletin board and say you can decorate it however you like, but not in certain ways? What do we do with the fact that the district has limitations on what's up there? What we do with that is we define curriculum the way other courts and the way this court has. This court hasn't defined curriculum yet, but if we define curriculum consistent with the other courts that have defined it as anything that is knowledge or information imparted by a teacher during the school day, that's teacher speech that's hired, it's not permitted, then the material that's on the bulletin board is under our control just as well, as long as it's communicated to students. The issue is whether it's directed towards students or not. I think that if he had a little bulletin board or a little place right beside his desk where he had inspirational messages that were directed only to him, I don't think that raises a problem. I don't think it would raise a problem based on the testimony of the administrators in this case. The issue here is a seven foot long banner across the room where the students can't miss it with repeated references to God and to the nation in a sense that communicates to students that the United States is a Judeo-Christian nation. That may make someone in the room who feels differently uncomfortable. Were there any student complaints? I'm sorry? Were there any student complaints? There were none. Was there any inquiry made of students to see if they had a reaction one way or the other to the banners? There was none. The only thing that we had is one teacher asked the question, didn't really even make a complaint, but asked the question, why can he do that and I can't? Had that teacher been prohibited from doing something? I don't even know that. I only have in the record what the question was. I guess he felt that he couldn't. I want to make this important point, I think. In 2002, this court looked at one of those phrases, one nation under God, in the context of the Pledge of Allegiance. There was a lot of press on that, that this court had outlawed one nation under God in the Pledge of Allegiance. This happened during the couple of years after that, and I think teachers like that teacher probably thought he couldn't put that up because of some of that news. Now, I know the court took a different position on that in Newdow III. But he had had these banners up for more than 25 years. Yes, he had. And nobody had ever said anything. Nobody had ever said anything, and nobody had ever even noticed them. We couldn't find an administrator who could even remember seeing them, and I have two answers to that. One is a legal answer, that the district doesn't create an open forum or doesn't establish a right simply by the passage of time under case law. But factually, realistically, administrators don't very often go into senior respected teachers' classrooms. This is an excellent teacher. He has a good reputation in the school for teaching math, handling his students well. And I think after about 10 years, under California law, you are statutorily required to evaluate a teacher every two years. After you've done that about five times, I think administrators quit going into the classroom. But this was a new principle. Ms. Kastner had just taken over at the high school. True. And apparently, if anything had been said to her predecessors, no action had been taken. Nothing was – we couldn't find any record of anything being said. The assistant superintendent, Collins, was deposed, and he was in the school for ages, and he didn't remember. He had evaluated this teacher, and he didn't remember ever even seeing them. And I have another explanation for that, and that is when a teacher goes into the room, when an administrator goes into the room to evaluate a teacher, he's not looking at the walls too much. I think he's looking at the teacher. Well, he couldn't have missed it, based on the exhibits that I saw in the record. He couldn't have missed it. I agree. I wouldn't want to get into a debate about that. It was large, and their concern with it was that it was large when it came to their attention. But I think that if you go into the room looking at the teacher and the interaction of the teacher to the students, you may not even look at the walls, particularly with a – But didn't Principal Kastner testify that one of the first things she was surprised at was the size of the banner? Absolutely. Seven feet by two feet? Yes. Okay. And then the word God was in much larger font than any of the other words in the phrases? The word creator in the second banner was much larger type, and all caps, like it was shouting the word. And she was surprised by that. Why didn't she notice it when she was in that classroom before? Would it have made any difference if Mr. Johnson was a civics or social studies teacher rather than a mathematics teacher? The New Dow Three and some other cases have taught us that the word context is extremely important. So I think the answer to that question has to be it would change the context, and that may make the analysis a little bit different if it was a social studies class. If it was a history class and the item to be discussed, my argument, my statement right now almost sounds silly to me, because this was up for 25 years. It wasn't up for a few days on a particular subject for a particular period of time. All of those things would change the context. What's difficult for me in part is the fact that one of the phrases that the principal found or the superintendent found objective, objected to, was one nation under God. And yet every day in Mr. Johnson's classroom they say the Pledge of Allegiance, right? Absolutely. And that phrase is in the Pledge of Allegiance. Yes, it is. So it's okay if you say it in the middle of the Pledge of Allegiance, but if you put it on a banner and put it up on the wall, suddenly that's not okay. And I think I was rather surprised by these administrators' understanding of the current state of First Amendment jurisprudence. They actually said that was because of the context. They thought that taking it out of the Pledge of Allegiance and putting it on a banner with other phrases that referred to America and God altogether changed the context and changed the message. And it appeared to them that the banners were directed at students with the intent to communicate something different than the context of the words one nation under God as a part of the Pledge of Allegiance where you come down to the end and you say one nation, indivisible, with liberty and justice for all. Why didn't they ask the students? What strikes me about this case is how hypothetical it is, how detached it seems to be from reality, because we have all this concern about impact on students, and yet there's no effort made to inquire as to what impact, if any, there is on the students. Well, I don't think that it would have... Here was my thinking on why we didn't take the depositions of a bunch of students, because I thought we'd get decisions that were all over the place. We would get answers that were all over the place. Even that's too late. I mean, I'm really kind of astonished that the administration makes a decision based on what they think might happen without chatting up a couple of students. I mean, find out if anybody objects. If this is based upon concern about how students will react, then maybe there ought to be some evidence of students reacting, and there isn't any. Well, he couldn't lead prayers whether or not students objected, could he? He couldn't. I don't think it matters whether the students objected or not. I think it's either legal or illegal. But that was the reason given. I mean, I read the brief, and it says she's concerned that non-Christian students might adversely react. She didn't even know if there was a non-Christian student or a Scientologist or someone else in that room. She didn't know that. She just thought her gut issue was, I think it would make some students uncomfortable. And did she ever ask? She did not. She did not. And I think that's the correct reading when we get down to the establishment clause, the endorsement test. That's a whole other set of issues. I'm saying at the threshold, this problem struck me as more theoretical than real. I think we thought it was illegal. I think we thought we'd be in trouble. Well, that's something else again. And frankly, I disagree with you on that proposition. But the state of this nation's establishment clause jurisprudence is such that who knows what's okay and what's not. And I'm hoping, and that's one of the points I want to make on the issue of freedom of speech. I'm hoping that this court can give us a bright line rule. And the bright line rule that I would request is that this court follow the idea in Pelosa and Downs and the holdings, the language of Lee versus York and Mayer, and define curricular speech as outside of the arena. Define it as hired speech and define it broadly. Define curricular speech as any information, any knowledge imparted by a teacher to a student during class time or during the contract day or during the work day or some language like that so that we have a bright line rule and we leave teachers with their constitutional right to speak as they're leaving or as they're off campus or in the lunchroom or on their break or other times like that. But when they're working for the school district, a broad definition of curriculum and the exclusion of curricular speech from the protections of the First Amendment would give administrators a bright line rule and hope to at least understand teacher speech. Help me write the opinion. If we write the opinion in such a way that we do that, would Mr. Johnson as the advisor to the Christian Club be able to unfurl his banners while the Christian Club is meeting in the classroom after school hours? Absolutely. So we're going to have to put an exception into our bright line rule. When he's volunteering, when he's off of his time, when he's dealing with that student group, I don't think that's contract time. You would call that extracurricular? I would call that extracurricular. Okay, I see you wanted to reserve five minutes and you're down to about three. Thank you. Establishment clause issue. My principal argument is that the school principal nailed the endorsement test by saying that she was concerned that some kids would feel like outsiders. We didn't violate it because we had a secular purpose. Our primary effect didn't inhibit his religion because we offered him other posters to put up there. And by removing it, we avoided government entanglement with religion. Moving on to equal protection, which frankly I think was the most complicated issue because it's fact heavy. And there's all of these other diagrams of all of these other things. I have very little time here left. So the thing that I would like to say is if the court would look at those Tibetan prayer flags in the picture that's in volume two at page 203 and ask the question whether any rational person could look at those flags that are called Tibetan prayer flags and come to any conclusion that their primary purpose was to endorse religion or that they had any primary purpose that related to religion at all. From the floor, those flags are high up and the one little Buddha that might be a religious symbol is about an inch, inch and a half tall among a group of flags far over in the side of the room buried in squiggles that I'm told are Sanskrit. And you haven't found anybody who can translate them? We haven't found anybody who could read it. The teacher who put those up asked her students, and she's got kids from all over including Thailand and areas close to the home of the Sanskrit language, and none of them could read it. None of them had any idea that it was religious and she was using it for a secular purpose to talk about carrying the flags to the top of Mount Everest and because she talked about seashells on the top of Mount Everest. Now, the trial court didn't believe that. He didn't believe her. But it's all the evidence we have. The only evidence that we have of her purpose in putting up the flags is that she put them up and used them in her curriculum to talk about evolution and seashells on top of Mount Everest. And while the secondary purpose of a picture of Buddha might be religious, the issue of whether the Tibetans believe in these flags or not doesn't reach our school district. The school district is concerned about documents or speech that would have the primary effect of establishing or endorsing religion and those flags don't do it, so the answer is we treated everybody alike and if somebody else had something up that endorsed religion, we would have pulled it down. We did not see that. And finally, a brief moment on qualified immunity. I was stunned when the trial court issued a $10 award of damages against these school board members and against these administrators. They did not punish Mr. Johnson. They have a good relationship with Mr. Johnson. This is a purely philosophical discussion and there's no possibility that anybody could know fully. In 2007 and 2008, that the words, one nation under God, up on the wall, were permissible in a school district, particularly after Newt L. Warren. Thank you. Thank you. Good morning. Good morning. May it please the court. My name is Robert Muse. I'm with the Thomas Moore Law Center. It's my privilege to represent the plaintiff at the Lee, in this case, Mr. Bradley Johnson. This case presents a unique set of facts, facts that are not contested, and facts that really matter at the end of the day. And based on the facts, the school district did create a limited public forum for the non-curricular personal speech of its teachers, including Mr. Johnson. Is that the analysis, or shouldn't we begin first with the Supreme Court's decision in Pickering, Garcetti, Connick, and ask whether or not this was actually hired speech by a public employee, who is directed by the school board to teach a particular subject matter, and is entitled to make policy as to what may and may not be taught in the classroom? Well, I think, Your Honor, when you look at the First Amendment jurisprudence, when you're dealing with the use of the government facilities, and whether the limits of the government can place on the use of the facilities for the purposes they're designed for, as opposed to their use of those facilities or property for expressive activity, you conduct a forum analysis. Even though the audience is captive? Even though the audience is captive. The forum analysis is the principal analysis based on these facts. And regarding counsel's... That's not what we said in Paloza, is it? Or in Downs? In Downs it's interesting. In Downs dealt with... Downs did a forum analysis. Would have done a forum analysis if they had determined that the speech was personal, non-curricular speech. And because it was government speech and the government speaking, then you don't have the First Amendment issue because you went to the government speech... So don't we need to make that decision first? What kind of speech was this? And all you have to do is look at the testimony of the people in the school district who was testifying pursuant to Rule 30b-6 as to what is curriculum and what is not curriculum. And that's why facts matter. The record without exception, they testify that this is personal, non-curricular speech. It's not related to the curriculum. They testify to that and those are the facts. I'm not sure it's the same thing. It's the captive audience that strikes me. The principal audience of this are a bunch of kids that are required by law to be in that classroom for whatever the length of the period is at that school each day. That's the target audience. And the target audience is there only because of the school district. I'm not sure I understand why it is that we disregard the fact that this is something that's happening during the school day, through the vehicle of the school, a commentary being offered up by somebody who's an employee of the school. Why do we disregard all that? Well, think of it in this term, Your Honor, because, again, the question of the First Amendment deals with the government restricting speech, restricting the speech of an individual, whether it be an employee or an employer, and certainly Tinker makes the point as well as other cases that teachers don't surrender their constitutional rights. Only you don't take the position that the school couldn't ban this altogether. They can close the forum. And, see, this is where the problem comes in. Because they created this forum for personal non-curricular speech, the government could, based on the arguments of opposing counsel, they could say, All right, teachers, we're going to allow you to put up campaign posters, but we're not going to allow you to put up Democrat campaign posters. Those of you who want to put up posters to promote the campaign of John McCain or some other Republican candidate, you go right ahead and do so. You put them up on your classroom walls. But you teachers who want to put up Republican posters or Democrat posters, you can't do that. See, here's the problem. They created the problem themselves. I mean, you look at Widmar v. Vinson in the case law dealing with the forum analysis, when the government creates the forum, when they allow this personal non-curricular speech where there's no dispute that that's what they've done, they have to live by the limits that they set for themselves. And in that forum, you can't make viewpoint-based discrimination. If they want to retain the control of their classrooms, then close the forum. They have that option available to them. The fact that they won't. Let's suppose that we disagree with your analysis of how the forum is characterized, and we find, for the reasons articulated by Judge Clifton, that this forum is closed. Doesn't that strengthen the right of the school district to dictate what may or may not be posted on its walls inside its classroom, particularly when the contents are being displayed to students who have to be there? You still have a problem with the discrimination based on viewpoint, even in a non-public forum. But do we have a problem? Under the Pickering test, if we conclude that this is not a speech of a public interest, if it is instead the employer's speech, which is to be confined to whatever curriculum Mr. Johnson, as a teacher, is supposed to be teaching, then the Supreme Court has told us there is no First Amendment protection. The school board can tell Mr. Johnson what he may say and what he may not say when he's on the clock for them. That implicates a couple of cases. Not nearly so much Pickering, but in a sense it does, because Garcetti dealt with that question of whether it was pursuant to the duties that they were hired to do. Under Garcetti, it would be government speech. Under this Court's decision in Downs, where they found that it was the government speaking, it's government speech. So if it's the case Pleasant Grove, if it's government speech, if it is government speech and not non-curricular personal speech of the individual, they can make those restrictions. But that's why the facts matter. In Lee, they said it was curricular speech, but they don't have the record. And they even said in that decision, the Fourth Circuit, that had it been personal, non-curricular speech, the school district would have had to have shown that there was a material, substantial disruption in the school district to restrict that speech. Well, let me come at it a different way. If you take the position that nothing on the walls of Mr. Johnson's classroom could be curricular, then what do we do with these huge white chalkboards that I see on ER 284, in which I presume Mr. Johnson, when he's teaching calculus, writes calculus formulas? The fact that they opened the forum to allow personal non-curricular doesn't mean that the forum can't be used for curricular speech either. I'm not sure if I fall. That seems to be the notion of the equation. But if Mr. Johnson is using the same location in order to carry out the directives of the school board to teach mathematics, why doesn't the school board have the right to say to him, we want you to teach mathematics. We do not want you to be talking about religion when you have this captive audience. And if they want to close the forum and exclude the personal non-curricular speech of the students, tell Lori Brickley that she can't put up her promoting gay rights, promoting environmental causes, promoting the anti-war causes, or don't put up your Barack Obama campaign poster, or don't put up all these other personal items. If they want to take that position, they can. They can't signal out Mr. Johnson after having done so, after having allowed his banners up for 25 years, and say, you know what, we don't like your viewpoint. They're still the government at the end of the day. And school districts and schools themselves are not enclaves of totalitarianism, taking a quote from the Tinker case. That's the problem we're running into, and that's why these facts are so important, and why it's distinguishable from Pickering, Connick, Downs, Garcetti, all those other cases. They chose to open that forum and allow the personal non-curricular speech, and they have to live by those restrictions. Suppose we define curricular to include more than what the teacher says when class is in session. Suppose we define curricular to say that a teacher is employed as a leader to impart all kinds of information to students, and that is done in addition to what is said in the classroom by other things that the teacher does while he is on the school premises. And so, with that said then, would the court then license a school district such as Poway during the next campaign election that will allow the teachers to put up all the Democrat, all the campaign posters for Barack Obama, but none for any Republican appointee? That's a huge problem. Are you saying there are no limits to what they can regulate as far as his bulletin board goes if it's an open forum? Could he put up white supremacy posters? It's a limited public forum, so you can make content-based restrictions in a limited public forum. They could say no political campaign posters. They could say that. How about no religious stuff? For example, if you wanted to preclude crosses and Ten Commandments displays, they could do that. Goodness, they have the Tibetan prayer flags, a sacred item. But his point is that there's really, in context, no religious significance to the Tibetan prayer flags like there is to what Mr. Johnson did. You're comparing apples and oranges. That's nonsense. Thirty-five to forty-foot Tibetan prayer flags with images of Buddha on them, they knew they were Tibetan prayer flags. They described them as Tibetan prayer flags. Comparing those to these historical phrases, those historical phrases are not from sacred text. They're from our founding documents. They don't represent any particular religion. They are historical in nature. Those slogans... It's hard to take that straight given the display of the word creator. And you look at the picture, there's obviously a message meant to be conveyed there. It's not an accident that Mr. Johnson is conveying what happened to be his personal views with regard to the existence and importance of God. A view I don't quarrel with, but to suggest that these are a bunch of historical documents, that's just not how it is. I think it is how it is, Your Honor. In particular, when you look at the context of the fact that the role that religion played in the history of our nation. Any different than you see a poster of Mother Teresa or Martin Luther King or Gandhi, I don't think there's any problem with having those in the classroom. Nobody's discussed any concern with those. These are historical banners. They're not quotes from the Bible. They're not sacred text. Even creator in the actual words of the Declaration of Independence is capitalized. The Declaration of Independence uses the word nature... Are all the words in the word creator capitalized in the Declaration of Independence? No. Only the first one. But the first letter is. And the banner, what is it? That's correct. But to say that a student doesn't understand that that is from the Declaration of Independence, I think we've got bigger problems than what Mr. Johnson's hanging on the side of the wall. To say that the student doesn't understand that there's a religious message meant to be conveyed here suggests we have bigger problems still. You're telling me the students don't pick up the religious message? That this isn't meant to convey a religious message? It is not meant to convey a religious message that is impermissible under the established law. Stop. Don't give me the legal question. You're saying it's all about facts. And I'm asking, are students likely to infer from these banners a religious message? No. No? No. In God we trust is our national motto. Declaration of Independence is our founding document. Okay. So your case rests on the premise that students won't infer a religious message from these banners. It doesn't rest on that premise, Your Honor. For them to make a viewpoint-based distinction, and if they're going to rely on the establishment clause, their fear cannot be an unfounded fear. And that is an unfounded fear based on the facts of this case. First of all, it is Mr. Johnson's speech. And any student in that classroom, when you look at all those photographs, you go to any particular classroom any day, and you will see that that classroom represents the personalities, opinions, and values of that teacher, whether that person is a sports fan, whether that person is a social activist like Lori Brinkley. And if you look at Mr. Johnson's, the greatest number of pictures in his classroom are nature pictures. I mean, you walk into his classroom, you say, there's somebody that loves nature, and he's got his red, white, and blue banners and the Declaration of Independence. You go into another classroom, you see somebody who's anti-war. You go into another classroom, you see somebody who's pro-war. Counsel, if we accept your position, aren't we constitutionalizing every grievance that Ms. Brinkley or some other teacher might have about the contents of some other teacher's room? Aren't we doing exactly what the Supreme Court told us in Garcetti that federal courts should not be doing? You really don't want federal judges making quarterly visits on campus to make sure everybody's complying with the First Amendment, do you? The response to that, Your Honor, is as I stated before. If they don't want to create this limited public forum, then they don't have to do so. The fact that they did, they have to abide by the law in that particular forum. That's why this case is so unique than the others. If we want to close this forum and make it just curriculum, make it only the items that the school district directs to put up, they're more than free to do so. They could have done that from the beginning. The fact that they don't want to do that, and they like to pick and choose which social issues they want the teachers to particularly promote, that should cause us pause for concern. But if they do that, and if we find that it's their speech, not his speech that is being uttered inside this classroom, then they can change it any time they want, can they not? Because the First Amendment doesn't protect him. If they did not create the limited public forum, then exactly. But that's why the facts of this case matter. Whether they created a limited public forum, the testimony is without equivocation or exception, personal, non-curricular speech of the individual teacher. And that's what Mr. Johnson was doing. And when you pick and choose amongst viewpoints in a forum that you created, that is a problem. And it's a problem in a public school because it's the government. And as I stated before, they're not enclaves of totalitarianism. They can't become, the government can't have that sort of control. If they want to create that forum for the speech, then they have to live by those restrictions. But the Supreme Court has told us that if it is their speech, and if the public disagrees with the way that the school board is running the school, then the answer is the ballot box to get rid of the members of the school board and put other people in charge who will run the school in a different way. We don't subject constitutional rights to democratic vote. If he has a constitutional right that is cognizable in a federal court. And it is in the sense that they created that forum. If they didn't create the forum, we don't have the promise in here today, but they created that forum, they can close that forum tomorrow. They haven't lost control. That's why this case is distinguishable. Even Hazelwood, the court, used a limited public forum in a particular school context. Lee made the point if it was non-curricular personal speech would have a different issue. Downs makes the point if it wasn't the school's speech, then we'd have a different issue. That's why the facts matter in this case. You can't escape the fact that they created this limited public forum.  Otherwise, we raise even greater constitutional concerns. They can close that forum tomorrow. They have absolute control if they want to do that. They chose not to do that, and that's where the problem becomes. Now they're picking and choosing and discriminating on the basis of viewpoint. Thank you very much. Mr. Seeth, you have one minute left. I would like to change my answer, Judge Solomon. I said that he could unfold his banner at the noon meeting or after school meeting of the students. The students could unfold his banner. If the banner's up on the wall, there's no problem. Advisors for the Christian group are not supposed to be leading that particular activity. He shouldn't unfold it. But if he wants to hand it to a student and the student unfolds it, I'd be happy with it. There is a footnote in Garcetti that this court hasn't addressed yet, which deals with academic freedom. There are courts out there that have said K-12 doesn't get the application of academic freedom, and I think that's another thing that needs to be in this is this court needs to address that issue and determine whether academic freedom only applies to the publishing issues for university professors and doesn't apply, and we would suggest that it does not. And that broad definition of curriculum would be important. I see your time is up. Thank you, Mr. Slink. Thank you, too, counsel. The case just argued is submitted. We'll stand in recess.
judges: Silverman, Tallman, Clifton, Cjj